NOTICE

Decision filed 11/30/20. The
text of this decision may be
changed or corrected prior to
the filing of a Petition for
Rehearing or the disposition of
the same.

2020 IL App (5th) 160020-U

NO. 5-16-0020

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under
Supreme Court Rule 23 and
may not be cited as precedent
by any party except in the
limited circumstances allowed
under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Alexander County. |
| | ) | |
| v. | ) | No. 13-CF-75 |
| | ) | |
| WILLIAM CURTIS WILKERSON, | ) | Honorable |
| | ) | Mark H. Clarke, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Moore and Overstreet concurred in the judgment.

**ORDER**

¶ 1　*Held*:　Defendant's claim of ineffective assistance of counsel fails where most of counsel's alleged errors constituted sound trial strategy and the defendant cannot demonstrate that he was prejudiced by any of the alleged errors.

¶ 2　The defendant, William Curtis Wilkerson (also known as Curtis), shot Clifford Williams multiple times, seriously injuring him. The defendant was charged with attempted first degree murder. At trial, he argued that he acted in self-defense. He now appeals his conviction, arguing that his trial attorney provided ineffective assistance of counsel by (1) failing to object to inadmissible hearsay statements, (2) soliciting harmful testimony from a law enforcement officer, and (3) failing to request that the jury be given Illinois Pattern Jury Instructions, Criminal, No. 3.12X (hereinafter IPI Criminal No. 3.12X). We affirm.

1

¶ 3                                I. BACKGROUND

¶ 4     The shooting involved in this case occurred after a heated argument between two couples over some rented furniture. Williams and his girlfriend, Airryon Brown, rented the furniture from Aaron's Furniture while they were sharing an apartment in East Prairie, Missouri. Brown's cousin, Samantha Dean, is the defendant's girlfriend. During the summer of 2013, Williams and Brown moved out of their apartment, and both moved in with different family members in Illinois. Dean helped Brown and Williams move out of their apartment. The rented furniture ended up in the Cairo, Illinois, home shared by Dean and the defendant. According to Dean, she purchased the furniture from Brown for $400. According to Williams, Dean offered to wait in the apartment for employees of Aaron's to pick up the furniture, and he only learned that the furniture had not been returned in early October 2013.

¶ 5     On October 16, 2013, the day of the shooting, Williams drove to Cairo to attempt to retrieve the furniture. At the time, the defendant and Dean shared a home on 11th Street in Cairo, and Brown lived with her grandmother on the same block. Williams arrived at Brown's grandmother's house at approximately 1:30 in the afternoon. The shooting occurred at approximately 6:55 p.m., after multiple confrontations between the two couples.

¶ 6     At trial, Williams, the defendant, and Dean gave accounts of the events leading up to the shooting. Williams testified that when he arrived in Cairo, he and Brown saw Dean outside. Brown told Williams she was going to talk to Dean about the furniture. Williams waited in the car for several minutes while the two women talked. He then got out of the car, approached the two women, and asked Dean about the furniture. According to Williams, Dean responded by saying, "I'm fixing to call my guy over here. You can talk to him." The defendant arrived shortly

2

thereafter. Williams told the defendant that the furniture was stolen, and the defendant responded by saying, "Whatever Samantha says."

¶ 7   According to Williams, the defendant and Dean walked away after this conversation. Williams asked Brown to call the police because he felt that they were not "getting anywhere" in discussing the situation with the defendant and Dean. He also called Aaron's Furniture and told the employee who answered the phone where the furniture was located. The employee told him that someone would come to pick it up.

¶ 8   Two Cairo police officers responded to Brown's call. The officers left for at least 5 to 10 minutes and then returned. Williams testified that when the officers returned, one of them told him that the dispute over the furniture was a civil matter and that if he or Brown called the police about it again, they would both be arrested and charged with abusing 9-1-1.

¶ 9   After the officers left again, Williams and Brown continued to wait in their vehicle for someone from Aaron's to arrive. When the Aaron's employees arrived, Williams told them where the furniture was and asked them to call the police to assist in recovering the furniture. He did not want to call the police because he had been threatened with arrest if he did so. Pursuant to Brown's suggestion, they then left and drove to the home of Stephanie Box, Dean's mother and Brown's aunt, to enlist her assistance in convincing Dean to return the furniture.

¶ 10   Another confrontation occurred at Box's house. Dean arrived while Williams and Brown were explaining the situation to Box. According to Williams, Dean was angry that they had involved her mother. She said, "You must want to fight. And Curtis got something for you." Dean also accused Brown of wanting to start a fight.

¶ 11   After this confrontation, Williams and Brown returned to 11th Street to see if the Aaron's employees were able to retrieve the furniture. When they got there, the Aaron's truck was gone.

3

Williams called the store to find out if the furniture had been picked up. He testified, "They said, 'No, we had to leave because the guy that is out there on the porch, he had came up to our truck hitting on the window and acting crazy.' " Williams acknowledged that the speaker did not identify the man on the porch. He testified, however, that when he drove past the defendant's house, he saw the defendant and another man sitting on the porch.

¶ 12    Williams next testified that Brown told him she saw Dean's car at the Spirit House, a liquor store. They drove to the Spirit House to confront her. He testified that he and Brown both got out of their vehicle, approached Dean's vehicle, and "exchanged a few words" with her. He further testified, "She said she was going to have Curtis air me out or something." The prosecutor asked Williams to clarify the meaning of the phrase "air me out," and defense counsel objected. The court responded, "First of all, let's identify the words." Asked to repeat what he heard Dean say, Williams testified, "She was basically saying we're going to air that mother fucker out. She was telling Airryon get your son and yourself out of the car because we're going to air it out." Asked what he understood this to mean, Williams replied, "Airing out means shooting." Defense counsel made no further objections to this line of questioning.

¶ 13    Williams acknowledged that after Dean said this, he "kind of pushed the door, being upset." We note that although this is not clear from Williams's account, other witnesses testified that Dean was sitting with her legs outside of the open driver's side door when Williams and Brown approached her. On cross-examination, Williams denied that he slammed the door against Dean's legs. He admitted, however, that he pointed at her and cursed angrily. Williams acknowledged that he never heard the defendant use the phrase "air you out."

¶ 14    Williams testified that after he left the Spirit House, he drove to a nearby Cut Mart gas station to buy gas. That is where the shooting took place.

4

¶ 15     The defendant testified that his first encounter with Williams and Brown on the day of the shooting took place at approximately 1:30 p.m. in front of the home he shared with Dean. Dean was not home when Williams and Brown arrived; however, she returned during their conversation. According to the defendant, Dean told Williams that she would not return the furniture unless she got her money back, but Williams would not agree to this exchange. He testified that Williams became agitated as the discussion continued.

¶ 16     The defendant testified that the discussion lasted for approximately 20 minutes. After that, Williams's vehicle remained parked on 11th Street in front of a neighbor's house. The defendant observed Williams "ranting and raving toward Airryon Brown." He then saw Williams walking up and down the street. This led to a second conversation between the two men. The defendant asked Williams if he was okay. Williams told the defendant that he only wanted to get his furniture. The defendant told Williams that it was up to Dean because it was her furniture, not his.

¶ 17     The defendant further testified that two police officers showed up at approximately 2:30. He stated that he did not call the police, and he assumed that Williams called them. The officers talked to Williams and then left.

¶ 18     The defendant spent most of the afternoon outside in front of his house that day. He explained that he planned to mow his lawn, but he needed to fix the lawn mower first. He testified that Brown and Williams remained in the neighborhood all afternoon. He noted that Williams would park his car in one spot, then pull out, circle the block, and park somewhere else. As time went on, the defendant became concerned about this behavior.

¶ 19     The defendant described a third conversation he had with Williams. While the defendant was walking his dog, he passed Williams in his vehicle. Williams was slowly pulling out of his parking spot at the time. The defendant asked Williams if they were "good." Williams said, "yes,"

5

and told the defendant that he was waiting for some people to arrive so he could get his furniture. The defendant considered Williams's statement that he was waiting for people to arrive to be "an alert."

¶ 20    Shortly after this third conversation ended, one of the police officers who responded to Williams's call earlier returned and spoke to Williams and Dean. The defendant confirmed Williams's testimony that the officer told them that he considered their dispute to be a civil matter and told them that he would arrest anyone who called the police again on the matter for abuse of 9-1-1.

¶ 21    The defendant next described his final confrontation with Williams before the shooting. This confrontation occurred while the defendant was sitting on the front porch of his home with his friend, Chris Nelson. According to the defendant, Williams drove by the house slowly. As he did so, he called out, "What's up?" The defendant testified that Williams held his arm out the window pointing a chrome object at the defendant and Nelson "as if it was a pistol." The defendant ran into his house and retrieved a pistol from his bedroom.

¶ 22    After this confrontation, the defendant sat on the porch for a while longer with Nelson. He received a phone call from Dean, who told him that Williams and Brown were trying to attack her at the Spirit House. The defendant told Dean to leave immediately. The defendant testified that when Nelson left to go home, he walked to the end of the block with him because they were concerned that Williams might still be in the neighborhood. Dean drove past that corner on her way home from the Spirit House. She pulled over, and the defendant got into her car, while Nelson turned the corner and continued to walk home. According to the defendant, Dean was noticeably upset. She told the defendant that Williams slammed her legs in the car door and threatened to "spray[ ] up the house." Dean then drove to Cut Mart to buy gas.

6

¶ 23 Both Dean and Box testified about their encounter with Williams and Brown at Box's house. Dean testified that Box called her at approximately 5:30 p.m. and asked her to come over because Williams and Brown were there. She denied threatening Williams and Brown. Box testified that she was upset that Williams and Brown wanted to drag her and her husband into their dispute with Dean and the defendant. She, too, denied that Dean threatened Williams and Brown.

¶ 24 Dean also testified about the incident at the Spirit House, which took place shortly after the confrontation in front of Box's house. She explained that she drove to the Spirit House to buy beer for the defendant. She testified that about a minute after she pulled up next to the drive-through window to place her order, Williams pulled his car in front of her, blocking her path. Williams and Brown got out of their car and approached Dean. According to Dean, Williams told her that he intended to retrieve his furniture "one way or another." He also told her he had guns and that he had "people on the way down here." She testified that Williams also said, "Tonight I'm killing you, your baby, and everybody in the house." She stated that he then slammed the car door on her legs. She explained that because the driver's seat window of her vehicle was broken and could not be opened, she had to open the car door so she could order at the drive-through, and her legs were outside the vehicle when the incident occurred. Dean denied telling Williams that the defendant would "air it out."

¶ 25 Dean testified that she called the defendant from the Spirit House and told him that Williams and Brown were trying to attack her. The defendant told her to leave. Dean backed her car out of the drive-through and drove home. On her way home, she saw the defendant walking with Nelson. The defendant got in the vehicle, and she drove to Cut Mart to buy gas. Like the defendant, Dean testified that during the short drive, she told him about Williams's threats.

7

¶ 26 Two employees of the Spirit House—Arlene Davis and Raymond Juneaurick—testified on behalf of the defendant. Both testified that they saw a man slam the car door on Dean's legs. Both also testified that they heard the man threaten Dean. According to Davis, the man was holding out his hand, mimicking the motion of pulling the trigger on a gun while he did so. Both Davis and Juneaurick acknowledged that they did not report the incident to the police.

¶ 27 Williams, Brown, the defendant, and Dean all testified about the shooting at Cut Mart. Williams and Brown both testified that Dean pulled into Cut Mart after them. Both testified that as Williams was walking to the entrance of the building to prepay for his gas, the defendant called out to him, "What's up?" Both Brown and Williams testified that Williams turned around and the defendant opened fire. Brown testified that the defendant fired four or five shots, while Williams testified that he fired six or seven shots. Both testified that Williams then ran across the street and collapsed in front of a building at 3900 Sycamore Street. Brown testified that the defendant did not stop firing until Williams fell. She further testified that Dean then drove off with the defendant in the passenger seat.

¶ 28 Dean testified that she drove into the Cut Mart slowly, intending to stop at a pump to buy gas. As she drove in, she saw Williams approaching the door to the building, but she then saw him turn around, nod his head, and walk at "a fast pace" to his own vehicle. According to Dean, Williams then leaned toward his vehicle as if he were reaching for something. The defendant testified that he was looking down at his smart phone reading a text message as Dean drove into the Cut Mart. When he looked up, he saw Williams near the door. Like Dean, the defendant testified that Williams then turned around and went back to his vehicle. He testified that Williams's left arm was "cuffed to where, like—as if he was holding something."

8

¶ 29    The defendant testified that at this point he fired the gun. He did not know how many times he fired. He testified that he did not intend to kill or injure Williams; his intent was to let Williams know that he would protect his family. (We note that Dean's four-year-old daughter was in the car with them.) The defendant claimed that he was not aware that any of the bullets struck Williams until he learned of his injuries later. He further claimed that he stopped shooting as soon as he saw Williams flee across the street.

¶ 30    Dean testified that she heard four or five gunshots, which prompted her to leave Cut Mart without buying gas. She testified that she did not initially realize that the defendant was the shooter. She claimed that she did not even know he was carrying a weapon until she saw him bring his arm into the vehicle from the open window and place his gun on the floor. The defendant testified that they left the scene because they did not know Williams was injured and they were afraid he would retaliate. The defendant admitted that he threw the gun into the river. He claimed that he did so because he was "overwhelmed."

¶ 31    Four bullets struck Williams. He sustained injuries to his leg, chest, and lung. Williams underwent multiple surgeries to remove a portion of his lung and repair the damage to his leg. Although the defendant claimed that he did not continue to fire at Williams as he fled, police found three bullet holes in the walls and windows of the building at 3900 Sycamore, and they found bullet fragments on the property.

¶ 32    Both Dean and the defendant testified concerning previous incidents of violence involving Williams. Dean testified that prior to the day of the shooting, she told the defendant about four incidents she was aware of involving violent acts perpetrated by Williams. She acknowledged that she did not personally witness any of the incidents. The defendant testified that he recalled being

9

told of two such incidents by Dean—one in which Williams pulled someone's hair and another in which he gave someone a black eye.

¶ 33    Officer Rico Aranico was one of the first officers to respond to the scene of the shooting. We note, parenthetically, that he was also one of the officers who responded to Brown's call earlier in the day. Officer Aranico provided first aid to Williams until the emergency medical service (EMS) team arrived. He estimated that EMS arrived 15 minutes after the shooting. Officer Aranico was at the scene for approximately one hour. He testified that he did not search Williams's vehicle, and he did not observe any other officer doing so.

¶ 34    Sheriff Tim Brown also responded to the scene of the shooting. He was at home when he received the call and did not remember what time he arrived at the scene. He noted, however, that when he arrived, Williams was receiving medical care from the EMS team. Williams was subsequently transported to the hospital.

¶ 35    Sheriff Brown testified on direct examination that no weapons were found at the scene of the shooting. On cross-examination, he admitted that he allowed Airryon Brown to drive Williams's vehicle to the hospital because she was concerned about his condition, and she promised to come back and give police a statement. The following exchange with defense counsel then occurred:

"Q. Now, in your report, do you indicate—and if you need to refresh your recollection, I can give you your report—inventorying the Williams-Brown vehicle?

A. Yeah, I looked—I searched the vehicle before she left in it, yes.

Q. The question is, do you recall putting that in your report?

A. No."

Counsel then handed Sheriff Brown his report. After looking at it, he testified, "I don't see anything in my report about it." When questioned further about this omission, he testified that he would have written an inventory report if he had conducted an inventory search of the vehicle because it was to be impounded or if he had found anything of evidentiary value. On redirect examination, Sheriff Brown testified that he personally searched Williams's vehicle and found nothing in it of evidentiary value.

¶ 36    After Sheriff Brown testified, Airryon Brown was recalled to the stand. She testified that after the shooting, a crowd gathered at the Cut Mart. We note that this testimony was supported by the testimony of law enforcement officers, one of whom estimated that approximately 70 people were in the crowd. Brown further testified that she ran across the street to be with Williams, leaving the vehicle unlocked. She did not give any law enforcement officers permission to search the vehicle, and as far as she knew, the vehicle was not searched before she drove it to the hospital.

¶ 37    The defendant argued that he shot Williams in self-defense, and the jury was instructed on this theory. The jury, however, found the defendant guilty of attempted first degree murder.

¶ 38    The defendant filed a posttrial motion alleging, among other things, that counsel was ineffective for eliciting harmful testimony from Sheriff Brown—specifically, the testimony that he searched Williams's vehicle and found no evidence. Defense counsel then filed a motion to withdraw as counsel. The court granted counsel's motion and appointed a new attorney to represent the defendant. The new attorney filed an amended motion, incorporating the arguments in the original motion.

¶ 39    At a hearing on the amended posttrial motion, the court addressed the defendant's claim that counsel provided ineffective assistance in his cross-examination of Sheriff Brown, stating:

11

"You look at the cost and benefits of asking Sheriff Brown exactly what he did. There was some testimony that there was some delay. His police report wasn't 100 [percent] clear whether there was an inventory. For the attorney to ask the question and get an answer that perhaps he wasn't expecting happens."

The court denied the defendant's motion and subsequently sentenced the defendant to 12 years in prison along with a mandatory 25-year enhancement due to the use of a firearm. This appeal followed.

¶ 40                              II. ANALYSIS

¶ 41    The defendant raises three claims of ineffective assistance of counsel. He argues that counsel was ineffective for (1) failing to object to three inadmissible hearsay statements, (2) eliciting testimony from Sheriff Brown that he searched Williams's vehicle and did not find any evidence, and (3) failing to request that the jury be given IPI Criminal No. 3.12X. We reject all three claims.

¶ 42    We evaluate claims of ineffective assistance of counsel under the two-part test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 26. To prevail, a defendant must demonstrate both that counsel's performance was deficient in that "it fell below an objective level of reasonableness," and that the defendant was prejudiced as a result. *Strickland*, 466 U.S. at 687-88. To satisfy the first part of this test, the defendant must overcome a strong presumption that counsel's decisions constituted sound trial strategy. *Id*. at 689. To satisfy the second part of the test, the defendant must demonstrate a reasonable probability of a more favorable outcome "but for counsel's unprofessional errors." *Id*. at 694.

12

¶ 43    A defendant asserting ineffective assistance of counsel must satisfy both parts of the *Strickland* test. *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). Thus, if we find that the defendant is unable to demonstrate prejudice, we may reject his claim on this basis alone. *Strickland*, 466 U.S. at 697; *Coleman*, 183 Ill. 2d at 397-98. In this case, although we believe that many of counsel's alleged errors constituted sound trial strategy, we find that it is appropriate to dispose of the defendant's claims based solely on his inability to satisfy the prejudice prong of the *Strickland* test.

¶ 44    We do not believe it is possible for the defendant to demonstrate that there is a reasonable probability that the outcome would have been different had counsel not made the alleged errors for two reasons. First, the evidence of the defendant's guilt was overwhelming. There was no dispute that the defendant shot at Williams multiple times. Although the defendant testified that he stopped shooting as soon as he saw that Williams was fleeing, this claim is refuted by physical evidence—namely, the bullet holes and bullet fragments found at 3900 Sycamore. The use of deadly force is not justified as self-defense if the defendant uses more force than he reasonably believes is necessary to avert the danger. See *People v. Washington*, 2012 IL 110283, ¶ 35. Even if the use of force was otherwise justified, it was not reasonable for the defendant to believe that firing multiple gunshots at a fleeing victim was necessary to avert the danger. In the face of this evidence, it is not reasonably probable that the jury would have returned a different verdict.

¶ 45    Second, we do not believe any of counsel's alleged errors were harmful enough to the defendant's case to have played a role in the jury's verdict. We consider each of the defendant's claims in turn.

13

¶ 46                              A. Failure to Object to Hearsay

¶ 47    The defendant argues that counsel should have objected to three inadmissible hearsay statements during Williams's testimony. First, he contends that counsel should have challenged Williams's testimony that Dean said, "Curtis got something for you." Next, he contends counsel should have objected when Williams testified that Dean told him the defendant would "air him out." Finally, he argues that counsel should have objected to Williams's testimony that an unidentified employee of Aaron's Furniture told him that they were unable to pick up the furniture because a man on the porch was hitting the windows of their truck and "acting crazy." The defendant argues that all three statements were inadmissible hearsay, and the statement of the unidentified Aaron's employee was also inadmissible due to a lack of a proper foundation. He further argues that he was harmed by all three statements because they portrayed him as a violent person. We are not persuaded.

¶ 48    We will first consider the two statements attributed to Dean. It is worth noting that the defendant was not present when either these statements were made, and both statements were made during angry confrontations between Williams and Dean. In this context, the statements come across more as Dean blowing off steam than as genuine threats relayed by Dean from the defendant. It is also worth noting that counsel elicited testimony from Dean denying that she made either statement, and he elicited testimony from Williams acknowledging that he never heard the defendant threaten to "air [him] out." A defendant is entitled to competent representation, not perfect representation. *Tucker*, 2017 IL App (5th) 130576, ¶ 26. Here, counsel took steps to minimize the already limited potential for prejudice from Williams's testimony about Dean's alleged statements. We cannot say this decision fell short of the competent representation to which

14

the defendant was entitled. We also cannot find it to be reasonably probable that the jury would have reached a different verdict had counsel objected to the statements.

¶ 49    We turn our attention to the statement attributed to an unnamed employee of Aaron's Furniture. This statement, describing erratic behavior, had somewhat greater potential to paint the defendant in a bad light. However, we do not believe this isolated statement had any significant impact on the jury's verdict. As the State correctly points out, Williams's testimony about this statement was not highlighted in the State's closing argument, which reduced the potential for prejudice. See *People v. Campbell*, 2015 IL App (1st) 131196, ¶ 31 (finding that the defendant was not prejudiced by the admission of prejudicial gang evidence in part because the evidence was not highlighted in closing argument). As the State also points out, objecting to isolated, potentially harmful testimony can serve to draw attention to that testimony. As such, declining to object can constitute sound trial strategy. See *People v. Evans*, 209 Ill. 2d 194, 221 (2004). In any case, we do not believe a different outcome was reasonably probable had counsel objected to Williams's testimony about any of the three statements attributed to Dean and the unidentified Aaron's employee. Thus, we reject his claim that counsel was ineffective for failing to object.

¶ 50                          B. Sheriff Brown's Testimony

¶ 51    As discussed previously, Sheriff Brown testified on direct examination that no weapons were found at the scene of the shooting. On cross-examination, defense counsel elicited an admission that Sheriff Brown did not indicate in the report of his investigation that he ever searched Williams's vehicle; however, Sheriff Brown also testified that he did search the vehicle. On redirect, he reiterated that he searched the vehicle and testified that he did not find any evidence. The defendant acknowledges that "defense counsel appeared to be attempting to discredit Sheriff Brown by getting him to admit he had not been thorough." He argues, however, that "counsel was

15

clearly asking a question to which he did not know the answer." He further argues that this line of questioning hurt his case by allowing the State "to establish definitively that Williams did not have a gun in the car." We disagree.

¶ 52   We emphasize that when Sheriff Brown took the stand, Officer Aranico had already testified that, as far as he knew, none of the investigating officers searched Williams's vehicle. Counsel was also aware that Sheriff Brown's report of his investigation contained no mention of a search of Williams's vehicle. Under these circumstances, we believe counsel's attempt to undermine the sheriff's credibility by questioning him about this omission constituted sound trial strategy.

¶ 53   It is also worth noting that it appears that, as the trial court observed, Sheriff Brown likely provided testimony that defense counsel had no reason to expect. When counsel asked him whether he had mentioned a search of the vehicle in his report, Sheriff Brown volunteered that he searched vehicle instead of answering the question he was asked. When questioned about this omission, Sheriff Brown again avoided answering the question he was asked, instead testifying that writing a separate inventory report was only required if an inventory search is being performed on a vehicle that is to be impounded or any evidence is found in the vehicle. Counsel's performance must be judged based on the circumstances at the time of trial and not be viewed in hindsight. *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. In light of the circumstances at trial and the questions counsel actually posed, we do not believe his performance fell below an objective standard of reasonableness.

¶ 54   We also do not believe that a different result would have been reasonably probable had counsel not questioned Sheriff Brown about his failure to mention a search of Williams's vehicle in his police report. As we have already discussed, Sheriff Brown testified on direct examination

16

that no weapons were found at the scene. In addition, while there was testimony that the defendant and Nelson saw Williams point a chrome object toward them that they believed to be a pistol, there was no evidence firmly establishing that Williams was, in fact, armed. Thus, the State could have argued that Williams did not have a gun even without Sheriff Brown's testimony that he searched the vehicle. Indeed, the prosecutor pointed to other evidence in arguing that Williams was not armed. He highlighted the evidence that Williams did not pull a gun on Dean when he threatened her at the Spirit House, and he emphasized that neither the defendant nor Dean claimed to have actually seen a gun in Williams's hand at Cut Mart.

¶ 55    Moreover, we do not believe that the testimony undercut the defendant's claim of self-defense for two reasons. First, while the testimony did provide some support for the State's argument that Williams did not have a gun in his vehicle, contrary to the defendant's contention, the testimony did not "definitively establish" that this was the case. Although it is not clear exactly when Sheriff Brown searched the vehicle, his testimony indicated that he arrived after the EMS team, which, according to Officer Aranico, arrived approximately 15 minutes after the shooting. As defense counsel emphasized in his closing argument, there was evidence that the crime scene was not secured for at least 30 minutes, during which time a crowd of approximately 70 people had gathered. In addition, counsel highlighted testimony that Williams's vehicle was not locked during this time, and he reminded jurors that Sheriff Brown neglected to mention in his police report that he searched the vehicle, a fact that undermined the credibility of his testimony that he did so.

¶ 56    Second, it is worth emphasizing that for jurors to accept a claim of self-defense, they do not have to find that the victim was actually armed; they only have to find that the defendant reasonably believed that the victim posed an imminent danger of death or great bodily harm. See

17

*Washington*, 2012 IL 110283, ¶ 35. In his closing argument, defense counsel did point to the testimony that the defendant and Nelson saw an object in Williams's hand that they believed to be a pistol. However, he did not rely solely on this evidence in arguing that the defendant reasonably believed that Williams was armed. He also reminded jurors of the evidence that Williams made verbal threats to Dean at the Spirit House—threats to "shoot up" their house—and the evidence that Williams spent four or five hours driving around the neighborhood—behavior counsel characterized as "stalking." Counsel told jurors that after witnessing this conduct, the defendant had only a few seconds to decide how to respond when he saw Williams reach into his vehicle. Although the jury in this case obviously did not accept the defendant's claim of self-defense, as we discussed earlier, we believe the greatest flaw in his claim was the amount of force he used. We find that Sheriff Brown's testimony did not preclude the defendant from claiming that he reasonably believed Williams was reaching for a gun.

¶ 57    In summary, we believe defense counsel's questioning of Sheriff Brown constituted sound trial strategy, and we do not believe that a more favorable result would have been reasonably probable had counsel not pursued this strategy. Because the defendant therefore fails to establish either prong of the *Strickland* test, we must reject his claim that counsel was ineffective for questioning Sheriff Brown as he did.

¶ 58                                C. Jury Instruction

¶ 59    The defendant's last claim focuses on counsel's failure to request IPI Criminal No. 3.12X. This instruction provides:

"In this case, the State must prove beyond a reasonable doubt the proposition that the defendant was not justified in using the force which he used. You have [(heard testimony)/(received evidence)] of _____'s [(prior conviction of a violent crime) prior acts

18

of violence) (reputation for violence)]. It is for you to determine whether _____ [(was convicted) (committed those acts) (had this reputation)]. If you determine that _____ [(was convicted) (committed those acts) (had this reputation), you may consider that evidence in deciding whether the State has proved beyond a reasonable doubt that the defendant was not justified in using the force which he used." IPI Criminal No. 3.12X.

The defendant argues that counsel was ineffective for failing to request this instruction, which was necessary to help jurors understand the relevance of testimony about Williams's prior acts of violence. We are not convinced.

¶ 60    The purpose of jury instructions is to convey to jurors the legal rules applicable to the evidence in the case, thereby helping to guide their deliberations. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). A criminal defendant is entitled to jury instructions on his theories of the case as long as there is even slight evidence in the record to support those theories. *People v. Davis*, 213 Ill. 2d 459, 478 (2004). On appeal, we must determine whether the instructions given, "considered together, fully and fairly announce the law applicable to the theories of the State and the defense." *Mohr*, 228 Ill. 2d at 65.

¶ 61    The instruction at issue, IPI Criminal No. 3.12X, deals with what is known as *Lynch* evidence. In *People v. Lynch*, 104 Ill. 2d 194 (1984), a murder defendant asserting self-defense sought to introduce evidence of the victim's three prior battery convictions. The trial court excluded this evidence. *Id.* at 197. In reversing this ruling, the Illinois Supreme Court explained that evidence of a victim's aggressive or violent nature is relevant to a claim of self-defense for two reasons. *Id.* at 199-200. First, the court explained, "the defendant's knowledge of the victim's violent tendencies necessarily affects his perceptions of and reactions to the victim's behavior." *Id.* at 200. Second, the court explained that such evidence may provide support for the defendant's

19

version of events where witnesses give conflicting accounts. *Id*. The court therefore held that "when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence." *Id*. The court went on to hold that prior convictions for violent crimes constitute "reasonably reliable evidence of a violent character." *Id*. at 201.

¶ 62    The *Lynch* court did not address the question of what other types of evidence might constitute "appropriate evidence" of a victim's violent nature. Subsequently, however, Illinois courts have recognized that prior acts of violence, even without convictions, "can be adequate proof of violent character *when supported by firsthand testimony as to the victim's behavior*." (Emphasis added.) *People v. Cook*, 352 Ill. App. 3d 108, 128 (2004). It is important to emphasize, however, that these cases hold that prior acts of violence without convictions are not sufficient to establish a victim's violent tendencies unless there is evidence that the victim committed the acts. *Id*.; *People v. Hanson*, 138 Ill. App. 3d 530, 537 (1985).

¶ 63    In this case, pursuant to *Lynch*, the court allowed the defense to present evidence that Dean had told the defendant about four previous acts of violence by Williams. However, there was no firsthand testimony describing the incidents, as required by cases such as *Cook*. Dean testified that she did not witness any of the incidents firsthand, and neither she nor the defendant provided any details concerning the incidents. Thus, it is not clear that the defendant would have been entitled to the instruction had it been requested. Counsel cannot be found to be ineffective for failing to take an action that would be futile, such as requesting an instruction that would not have been given. See *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14.

¶ 64    The defendant also points to the evidence that Williams slammed Dean's legs in the door of her car. However, this was not an unrelated prior incident; rather, it was one of the events leading

20

up to the shooting. Indeed, it was the last confrontation before the shooting occurred just a few minutes later. Thus, it is not the type of evidence that was at issue in *Lynch* or its progeny, and it is not the type of evidence IPI Criminal No. 3.12X was intended to address.

¶ 65 Moreover, we do not believe the defendant can show that there is a reasonable probability that the result would have been more favorable if the instruction had been given. We reach this conclusion for two reasons. First, we do not believe the evidence showed that the defendant's perception of the situation at the time he fired at Williams was influenced by what Dean had told him about prior acts of violence. See *Lynch*, 104 Ill. 2d at 200 (explaining that a defendant's knowledge of prior acts of violence by a victim is relevant for this purpose). The defendant testified that he only recalled two of the prior incidents related to him by Dean, and there is no evidence concerning the details of either of them. He also testified that he became concerned about Williams only after Williams lingered in the neighborhood for several hours and announced that he was waiting for someone to arrive to help him retrieve the furniture.

¶ 66 Second, there was substantial evidence concerning Williams's conduct on the day of the shooting, including the incident in which he slammed the door of Dean's car on her legs. The defendant contends that, without receiving IPI Criminal No. 3.12X, jurors were likely to ignore this evidence and consider only what happened at Cut Mart. However, this evidence was the focus of defense counsel's closing argument. As such, we cannot find that jurors were likely to have ignored this evidence. For these reasons, we do not believe the instruction likely would have made a difference in the jury's verdict even if it had been given.

¶ 67                                   III. CONCLUSION

¶ 68 For the foregoing reasons, we affirm the defendant's conviction.

¶ 69 Affirmed.

21