NOTICE

Decision filed 05/20/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230634-U

NO. 5-23-0634

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Alexander County. |
| | ) | |
| v. | ) | No. 13-CF-75 |
| | ) | |
| WILLIAM C. WILKERSON, | ) | Honorable |
| | ) | Tyler R. Edmonds, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1     *Held*:  Where the defendant failed to make a substantial showing of a constitutional violation during jury selection involving *Batson v. Kentucky*, 476 U.S. 79 (1986), we affirm trial court's order dismissing the defendant's postconviction petition at the second stage.

¶ 2     In the underlying criminal case, a jury found the defendant, William C. Wilkerson, guilty of attempted first degree murder. On November 30, 2020, this court affirmed the defendant's conviction. *People v. Wilkerson*, 2020 IL App (5th) 160020-U. This appeal involves the second-stage dismissal of the defendant's postconviction petition. The defendant seeks a reversal and

1

remand with directions for the trial court to conduct a third-stage *Batson* hearing. For the reasons that follow, we affirm.

¶ 3                                   I. BACKGROUND

¶ 4      On October 16, 2013, Clifford Williams was a customer at a gas station when the defendant shot him multiple times. At the time, the defendant was a passenger in a vehicle being driven by his girlfriend, Samantha Dean. On October 18, 2013, the defendant was charged with attempt murder (720 ILCS 5/8-4(a) (West 2012)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and possession of a stolen firearm (*id.* § 24-3.8(a)). The defendant admitted shooting the victim after several earlier confrontations regarding a dispute over furniture. The defendant claimed that he shot Williams in self-defense.

¶ 5      The defendant's jury trial began on March 24, 2015. Dean was called as a witness by both the State and the defense. Dean's mother was Stephanie Box, who was married to Gerald Box. Her nephew was Jereb Box. Samantha Dean, Stephanie Box, Jereb Box, and Gerald Box were on the witness list which the trial court read aloud to the venire. The court asked if any prospective juror knew any of the names on the witness list or "recognized names" on that list. No prospective juror indicated that they knew or recognized any name on the witness list.

¶ 6      Later, when asked if anyone was related to someone in the venire, prospective juror Crittendon said his girlfriend was present. The State asked Crittendon if he and his girlfriend were both on the jury whether that would cause issues. Crittendon responded, "Yeah, probably." When asked what he thought the issue would be, Crittendon said, "Talking about the case." Crittendon confirmed that he lived with his girlfriend and despite being instructed not to talk about the case,

2

"It might come up." Defense counsel asked Crittendon if he could promise to not talk about the case with his girlfriend, and he responded, "Yeah, I guess." When defense counsel pressed for a firm promise not to discuss the case with his girlfriend, Crittendon replied, "I don't know. I don't know."

¶ 7    Regarding the *Batson* issue, the following colloquy occurred during jury selection:

> "THE COURT: You have Crittendon, McCain, Wolf and Terry.
>
> THE STATE: Move to strike Crittendon and Terry.
>
> DEFENSE: I'd like to have a Batson articulation of reasons.
>
> THE COURT: What is the basis for the Batson request?
>
> DEFENSE: Well, the juror is African American by appearance, under Batson I'm entitled to insist that the Prosecution articulate the nondiscriminatory basis for the challenge.
>
> ***
>
> THE COURT: Well, not every challenge of an African American requires a Batson hearing. Now, is there something about the questions and answers that you believe raise some question about the reason for Crittendon?
>
> * * *
>
> THE COURT: Okay. For the record, is there a race neutral reason for the challenge?
>
> * * *
>
> THE STATE: Judge, he was at one point—and I don't know if [defense counsel] could see this—sleeping. *** He didn't answer hardly any questions other than the fact that he didn't know if he could comply with the Court's rules not to talk to his girlfriend if she were also selected.

THE COURT: For the record, I have found that there is an insufficient basis for the Batson second prong. However, again, erring on the side of caution for the record I've asked for a race neutral reason, which I've received. The State's peremptory is on Mr. Crittendon. The State has McCain, Wolf, Terry and Pittman. And you indicated that you are exercising a challenge on Terry?

THE STATE: That's correct, Judge.

THE COURT: Who is also African American?

THE STATE: Yes.

THE COURT: Okay. I now have two African American[s] who have been the subject of peremptory challenges; although I found initially that there's not sufficient basis for a Batson inquiry, I will ask now for a race neutral reason for the peremptory.

THE STATE: Yes, your Honor. Previous to looking at the panel, I was informed that Ms. Terry had some associations with Ms. Dean's family, who I think is going to be—and I didn't inquire, but she didn't offer, but that's my reason.

DEFENSE: Well, I think then Ms. Terry needs to be *voir dired* about these associations. She wasn't asked about them and so she's been excluded for reasons that I don't know anything about.

THE STATE: A non-race based reason.

THE COURT: You were informed that there are certain connections between Ms. Terry and Ms. Dean, who is a witness for the Defense?

THE STATE: Yes, your Honor.

THE COURT: And she was not forthcoming when I asked whether anybody recognized any of the names on the list of witnesses?

4

THE STATE: Yes, your Honor.

THE COURT: And that is your race neutral reason for the peremptory?

THE STATE: Yes, your Honor.

THE COURT: And you have requested additional *voir dire* of Ms. Terry?

DEFENSE: Correct.

THE COURT: I'm granting your request of additional *voir dire* of Ms. Terry. Could we ask Ms. Terry to join us?

(Ms. Terry enters the room.)

* * *

THE COURT: Every now and then there are some additional questions that has come up that the attorneys think are appropriate to ask. And when that happens, rather than everybody just going back out there to ask a couple of questions, we come back in. When I read through the list of witnesses, I read through the name of Ms. Dean. Samantha Dean. Do you know the Dean family?

MS. TERRY: No.

THE COURT: No contact? No communication?

MS. TERRY: I didn't know any of the names you called.

* * *

DEFENSE COUNSEL: You might ask about Stephanie Box maybe, that's another name.

THE COURT: Do you know Stephanie Box or the Box family?

MS. TERRY: I know the name, but I don't know them. You know how you hear names? I know names and I know faces, but not together so I'm not—like I said I just sleep

5

here. I'm usually out of the town during the day and when I'm home I'm asleep. I haven't had any contact with Stephanie.

THE COURT: Any other questions from either side?

THE STATE: Judge, along those same lines, Gerald Box or Jereb Box?

MS. TERRY: I know the names but I don't—I don't interact with them.

THE STATE: You don't go to the same church?

MS. TERRY: No. I go to a church in Missouri, so no."

The trial court then questioned the prosecutor as follows:

"THE COURT: You challenged Ms. Terry because you were informed prior to the jury selection process that she had some connection to the Dean family.

THE STATE: Correct.

THE COURT: And the Box family?

THE STATE: Correct.

THE COURT: And that is the reason for the challenge?

THE STATE: That's correct.

THE COURT: I've heard the testimony of the prospective juror here, it's not a contest to figure out the extent, but I certainly see no reason to believe that she is untruthful based upon her manner and in asking the questions, but if there is a race neutral reason, if that's the question, then there is, the State's peremptory is number two."

¶ 8    Though the jury was given a self-defense instruction, they found the defendant guilty of attempted first degree murder. The defendant filed a posttrial motion alleging, *inter alia*, that the trial court violated *Batson*. At the hearing on that motion, the trial court recalled the *Batson* issue:

6

"I went beyond what was required and the Prosecutor told me that prior to the beginning of the case he was informed that that particular juror had some associations with Ms. Dean's family and the Defense counsel requested some additional *voir dire*, which I granted. And some additional *voir dire* came forth and there was basically a denial that she knew them at all, and the State repeated their objection, well, it's our understanding that she does and that's our reasons. And I ruled that was sufficient. I ruled then and I rule now that that was sufficient. So that motion is denied as well. The record does not support this basis raised in the post trial motion."

¶ 9 The court sentenced the defendant to 12 years in prison for attempt murder, plus the mandatory 25-year firearm enhancement and 3 years' mandatory supervised release, to run concurrently with the sentence imposed for a severed count of unlawful possession of weapon by a felon, to which he pleaded guilty before trial. The defendant filed a direct appeal, and this court affirmed his conviction on November 30, 2020. *Wilkerson*, 2020 IL App (5th) 160020-U.

¶ 10 On August 10, 2021, the defendant filed an initial postconviction petition. On February 22, 2023, the defendant filed an amended petition which attached his affidavit. The defendant averred that his delay in seeking postconviction relief was hampered during his incarceration by the prison lockdowns imposed during the COVID-19 pandemic. He stated the prison was in a "virtual lockdown," his access to the law library and other inmates who could have helped him file his petition was "totally restricted," and he was rarely allowed to leave his cell. The amended petition claimed, *inter alia*, that the trial court violated *Batson* when it allowed the State to use a peremptory strike on prospective juror Terry (Terry), who was African American like the defendant. The amended petition contended that (1) the trial court erroneously ruled that a pattern of discrimination had to be shown before a defendant could demand a race-neutral reason for the

7

challenge; (2) the trial court used a leading question to suggest to the State a race-neutral basis for the challenge; and (3) the trial court "erred by not permit[ing] the defense to question the prosecution to test the validity of the challenge to make a determination as to whether the challenge was a pretext." The amended petition also claimed that appellate counsel was ineffective for failing to raise a *Batson* argument on direct appeal. On September 29, 2021, the trial court found that the defendant's postconviction petition was neither frivolous nor patently without merit and advanced it to the second stage.

¶ 11 On November 12, 2021, the State filed a motion to dismiss the defendant's postconviction petition on the basis that it was both untimely and lacked merit. The State argued that the defendant's claims were forfeited because they were not raised in his amended posttrial motion or on direct appeal. Alternatively, the State argued that the trial court conducted a full *Batson* hearing and found that the State had given a sufficient nondiscriminatory reason for its peremptory strike to Terry; therefore, appellate counsel was not ineffective for failing to raise this issue on direct appeal.

¶ 12 The trial court dismissed the defendant's amended petition for postconviction relief on August 16, 2023, finding that the defendant had not met his burden of making a substantial showing of a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 22. The court initially found "that the Petition allege[d] facts which show his delay in filing was not due to his culpable negligence." The court then concluded that the defendant failed to carry his burden of proof to establish a *Batson* violation.

¶ 13                                              II. ANALYSIS

¶ 14 The Post-Conviction Hearing Act provides a three-stage procedure by which a defendant may challenge his conviction based on allegations of a substantial denial of his constitutional

8

rights. 725 ILCS 5/122-1(a)(1) (West 2020); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). At the first stage, the postconviction court reviews the defendant's petition to determine whether it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2020); *People v. Edwards*, 197 Ill. 2d 239, 244 (2001).

¶ 15    During the second stage, "counsel may be appointed to an indigent defendant and the State may file a motion to dismiss or an answer to the petition." *Domagala*, 2013 IL 113688, ¶ 33; 725 ILCS 5/122-4, 122-5 (West 2022). "The second stage of postconviction review tests the legal sufficiency of the petition." (Internal quotation marks omitted.) *People v. Dixon*, 2018 IL App (3d) 150630, ¶ 12. At the second stage, the petitioner bears the burden of making a substantial showing of a constitutional violation. *Id.* "If the State moves to dismiss, the trial court may hold a dismissal hearing, which is still part of the second stage." *People v. Wheeler*, 392 Ill. App. 3d 303, 308 (2009). "The purpose of the first two stages is to determine whether an evidentiary hearing is even necessary." *People v. Fields*, 2020 IL App (1st) 151735, ¶ 42. To succeed at this stage, the petition and supporting documentation must make a " 'substantial showing of a constitutional violation.' " *Domagala*, 2013 IL 113688, ¶ 33 (quoting *Edwards*, 197 Ill. 2d at 246). This court reviews the trial court's dismissal of a postconviction petition at the second stage *de novo*. *People v. Addison*, 2023 IL 127119, ¶ 17.

¶ 16    The Post-Conviction Hearing Act requires that "the petition [is] verified by affidavit" and that there are "affidavits, records, or other evidence supporting [the] allegations" attached to the petition "or shall state why the same are not attached." 725 ILCS 5/122-1(b), 122-2 (West 2020). Allegations made by the defendant are taken as true unless the allegations are refuted by the record. *Domagala*, 2013 IL 113688, ¶ 35. If the record rebuts the allegations or if the petition does not

9

contain sufficient facts to make a substantial showing of a constitutional violation it should be dismissed. *People v. Williams*, 209 Ill. 2d 227, 233 (2004).

¶ 17                                      A. Timeliness

¶ 18     The defendant contended that because he was incarcerated during the COVID-19 pandemic and the prison in which he was housed was on lockdown, he had limited access to legal resources and inmate help. Therefore, the fact that his petition was filed late should be excused.

¶ 19     Unless a defendant files a petition for a writ of *certiorari* in the United States Supreme Court, a postconviction petition must be filed within six months from the date that a *certiorari* petition would have been due, unless the defendant alleges facts establishing that the delay in filing was not due to his culpable negligence. 725 ILCS 5/122-1(c) (West 2020). Here, the defendant filed a direct appeal with this court and subsequently opted not to file a petition for leave to appeal in the Illinois Supreme Court. The relevant six-month period began after the deadline to file a petition for leave to appeal to the Illinois Supreme Court. *People v. Johnson*, 2017 IL 120310, ¶ 24. Because we affirmed the defendant's conviction on November 30, 2020, the defendant's deadline to file a petition for leave to appeal to the Illinois Supreme Court was January 4, 2021. Ill. S. Ct. R 315(b)(2) (eff. Oct. 1, 2020). Therefore, the six-month deadline to file his postconviction petition expired July 5, 2021. His petition was filed August 10, 2021, five weeks late.

¶ 20     We will not reverse a trial court's findings as to whether the untimeliness of a postconviction petition was due to culpable negligence unless those findings are manifestly erroneous. *People v. Gerow*, 388 Ill. App. 3d 524, 527 (2009) (citing *People v. Caballero*, 179 Ill. 2d 205, 214 (1997)). We review the trial court's ultimate conclusion on the issue of culpable negligence *de novo*. *Id.*

¶ 21   Culpable negligence has been alternatively defined as negligent conduct that, while not intentional, involves a disregard of the consequences likely to result from one's actions (*People v. Boclair*, 202 Ill. 2d 89, 106 (2002)), and as something more than negligence involving an indifference to, or disregard of, consequences (*id.*). Culpable negligence is greater than ordinary negligence and is like recklessness. *Id.* at 108.

¶ 22   A defendant must provide supportive and demonstrative allegations of specific acts to establish the basis for a court to excuse his late filing. *People v. Hobson*, 386 Ill. App. 3d 221, 233 (2008). Because the trial court did not conduct an evidentiary hearing, the relevant inquiry is whether assuming that the defendant's assertions are true, the assertions are sufficient as a matter of law to show an absence of culpable negligence. *Id.* Where a postconviction petitioner has alleged facts showing that the delay was not due to his culpable negligence, the time limit for filing the petition does not apply, and the untimely petition will not be dismissed. See 725 ILCS 5/122-1(c) (West 2012); *Johnson*, 2017 IL 120310, ¶ 26.

¶ 23   We find *People v. Upshaw*, 2017 IL App (1st) 151405, ¶¶ 23-27, analogous. In *Upshaw*, the defendant filed his postconviction petition eight months late. *Id.* Although the COVID-19 pandemic was not an issue in *Upshaw*, factually the defendant was unable to gain access to the prison's law library because that prison was the subject of frequent lockdowns. *Id.* In addition, the defendant's copies of trial transcripts and legal materials were lost by prison staff. *Id.*

¶ 24   Given the COVID-19 strictures in place in the defendant's prison that restricted his ability to not only meet with other inmates about his case, but also his access to the law library, we conclude that the trial court's findings on the issue of defendant's culpable negligence were not contrary to the manifest weight of the evidence. *Gerow*, 388 Ill. App. 3d at 527.

11

¶ 25                                    B. *Batson*

¶ 26    The defendant failed to raise a *Batson* issue on direct appeal. Therefore, this claim is forfeited. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). However, the Illinois Supreme Court has elected to relax ordinary forfeiture rules with respect to postconviction claims stemming from ineffective assistance of appellate counsel. In an apparent attempt to avoid forfeiture, the defendant now argues that appellate counsel was ineffective for failing to raise *Batson* on direct appeal. Appellate counsel is not required to argue every conceivable issue on appeal; rather, appellate counsel must exercise professional judgment to select the many potential claims of error that might be asserted on appeal. *Williams*, 209 Ill. 2d at 243. That strategic exercise of judgment is presumed reasonable. See *People v. Edwards*, 2012 IL App (1st) 091654, ¶ 31. To prevail on his claim that appellate counsel was ineffective, the defendant must make a substantial showing that appellate counsel's failure to raise *Batson* was objectively unreasonable and that, absent the failure, his conviction would have been reversed on direct appeal. *People v. Pingelton*, 2022 IL 127680, ¶¶ 52, 63-64. Appellate counsel does not provide unreasonable representation in declining to raise meritless issues, and a defendant cannot make a substantial showing of prejudice based on appellate counsel's decision not to raise issues that the appellate court would have rejected. *Id.* ¶ 64.

¶ 27    We now turn to the merits of the defendant's postconviction petition. In *Batson*, "the United States Supreme Court held the equal protection clause of the fourteenth amendment [citation] prohibits the State from using peremptory challenges to strike potential jurors solely on the basis of their race." *People v. Talley*, 2023 IL App (4th) 221013, ¶ 26. A court must engage in a three-step process when reviewing a *Batson* motion. *People v. Davis*, 231 Ill. 2d 349, 360 (2008). The first step requires a defendant to "make a *prima facie* showing that the [State] has exercised

12

peremptory challenges on the basis of race." *Id.* A defendant does so by producing sufficient evidence for the trial court " 'to draw an inference that discrimination has occurred.' " *Id.* (quoting *Johnson v. California*, 545 U.S. 162, 170 (2005)). To determine whether the requisite showing was made, the court "must consider 'the totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike to see if they give rise to a discriminatory purpose." *Id.* (quoting *Batson*, 476 U.S. at 94, 96-97). This decision requires consideration of the following factors:

" '(1) racial identity between the [party exercising the peremptory challenge] and the excluded venirepersons; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the [State's] questions and statements [of the challenging party] during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogenous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses.' " *People v. Rivera*, 221 Ill. 2d 481, 501 (2006) (quoting *People v. Williams*, 173 Ill. 2d 48, 71 (1996)).

¶ 28    Under *Batson*'s second step, the burden then shifts to the State to articulate a nondiscriminatory, race-neutral explanation for exercising the peremptory challenge to strike the prospective juror. *People v. Harris*, 206 Ill. 2d 1, 17 (2002). A race-neutral explanation is one based upon something other than the juror's race. *Id.* After the State provides a race-neutral reason for striking the juror, the defendant "may then rebut the proffered explanation as pretextual." *Davis*, 231 Ill. 2d at 363 (citing *Williams*, 209 Ill. 2d at 244). In the third step, "the trial court must

13

determine whether the defendant has shown purposeful discrimination in light of the parties' submissions." *Id.* (citing *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008)). "The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* (citing *Rice v. Collins*, 546 U.S. 333, 338 (2006)). "A trial court's determination as to intentional discrimination is a finding of fact and will not be overturned unless it is against the manifest weight of the evidence." *People v. Sims*, 249 Ill. App. 3d 246, 249 (1993). "[G]enerally a trial court's ultimate conclusion on a *Batson* claim will not be overturned unless it is clearly erroneous." *People v. Davis*, 233 Ill. 2d 244, 261 (2009). "A finding is clearly erroneous when a review of the record leaves a reviewing court with the definite and firm conviction that a mistake has been made." *In re A.S.*, 2017 IL App (1st) 161259-B, ¶ 23.

¶ 29 The defendant now alleges that the State violated *Batson* by excusing both potential jurors Terry and Crittendon. Having raised the issue of the State's peremptory strike of Crittendon for the first time on appeal, this claim is waived. *People v. Jones*, 213 Ill. 2d 498, 505-08 (2004); see also 725 ILCS 5/122-2 (West 2020) ("The petition shall *** clearly set forth the respects in which petitioner's constitutional rights were violated ***."). However, because Crittendon and potential juror Terry were in the same four-person panel, it becomes necessary to review the trial court's handling of both peremptory challenges since the court's findings and ultimate conclusion were intertwined.

¶ 30 The defendant argues that the trial court erred by (1) assuming that a pattern of discrimination by the State had to be established before the defendant had the right to demand that the State provide a race-neutral reason for its challenge; (2) suggesting a correct race-neutral response from the State; and (3) not allowing the defense to question the State to test the validity of its challenge.

14

¶ 31    Our review of the record discloses that the trial court never assumed that the defendant must establish a pattern of discrimination before demanding a race-neutral reason for a peremptory challenge by the State. With juror Crittendon, the State said he had fallen asleep during *voir dire*, and he could not avoid discussing the case with his girlfriend if both were selected for the jury. The court concluded that the State's reasons were neutral. We agree that the record clearly establishes that the trial court accurately observed that Crittendon's race was not sufficient to trigger a second-stage *Batson* inquiry. With juror Terry, the court initially found that there was no sufficient basis for a *Batson* inquiry, but because Crittendon was African American, the court proceeded cautiously and asked the State to provide a race-neutral reason for its peremptory challenge. By so doing, the trial court implicitly found that the defendant met its burden to show a *prima facie* case of discrimination.

¶ 32    The defendant now argues that with respect to Terry, the trial court erroneously collapsed the first and second stages of *Batson* into a single step. The record does not support that argument. The trial court is presumed to know the law and apply it properly. *Talley*, 2023 IL App (4th) 221013, ¶ 42. It was defense counsel who attempted to collapse the first and second stages of the *Batson* analysis. Defense counsel's immediate demand for a race-neutral reason for the State's peremptory strikes of both Crittendon and Terry was premature, because the court had not yet found a sufficient basis to require such a request. The court repeatedly refused to demand a race-neutral reason for the State's peremptory strike on Crittendon until it was satisfied that the defense had made a *prima facie* case of discrimination. The court explained that although it found an insufficient basis to move to *Batson*'s second step, it had erred on the side of caution and asked the State to articulate a race-neutral reason for its peremptory strike, which was provided. The

record supports the conclusion that trial court carefully separated the first and second stages of the *Batson* analysis.

¶ 33 When the court considered the State's peremptory strike on Terry, it first noted that she was the second African American prospective juror challenged by the State. Referencing its prior finding as to Crittendon, the trial court acknowledged that it had "found initially" there was no sufficient basis for further inquiry and then asked the State for a race-neutral reason for its challenge to Terry. This shows that again, the trial court was careful to separate the first and second stages of *Batson*. The fact that the court did not explicitly find the defense had established a *prima facie* case as to Terry fails to establish that it collapsed *Batson*'s first and second stages because the record establishes that the trial court nonetheless made this finding. See *Talley*, 2023 IL App (4th) 221013, ¶¶ 39-40 (record showed that "the requisite findings were made, even if the precise language was not used").

¶ 34 Additionally, here, the trial court went on to make a third-stage ruling on the ultimate issue of intentional discrimination. The court accepted the State's race-neutral reasons for striking Terry after offering the defendant the opportunity to rebut them. Where the trial court makes a third-stage finding that the State had an adequate race-neutral reason for exercising a peremptory challenge, the issue of whether the court collapsed the first and second stages of *Batson* becomes moot. See *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶¶ 64, 67, 69; see also *People v. Payne*, 2015 IL App (2d) 120856, ¶ 47.

¶ 35 The defendant also argues that the trial court erroneously collapsed the second and third stages of *Batson.* At the second stage of *Batson*, after the State presents its race-neutral reason for a peremptory strike, defense counsel "then may rebut" those reasons as being a pretext for discrimination. *People v. Easley*, 192 Ill. 2d 307, 323-24 (2000). Defense counsel commonly

chooses to try to rebut the State's reasons as pretextual by contending that the State did not strike similarly situated jurors of a different race. See *Payne*, 2015 IL App (2d) 120856, ¶¶ 44-49. The State's race-neutral reason for striking Terry was that during *voir dire* she failed to disclose that she had some associations with the family of Samantha Dean. Since no other prospective juror had undisclosed associations with the family of a listed witness, the defendant did not attempt to rebut the State's reasons as pretextual by claiming that the State was treating Terry differently than a similarly situated white juror. Instead, the defendant's attempt to rebut the State's reason as pretextual was to request the court to ask Terry additional questions about those purported associations, since she had not been asked about them during *voir dire.* This request was granted, and the court asked Terry additional questions in chambers, including a particular question regarding witness Stephanie Box, which was requested by the defense. After Terry was excused, the defendant declined the court's offer to add "anything further."

¶ 36    The defendant's third claim was that the trial court "erred by not permit[ting] the defense to question the prosecution to test the validity of the challenge to make a determination as to whether the challenge was a pretext." First, the defendant never asked the trial court to do so. Second, the defendant cites no authority to support the defendant's right to question the prosecution directly during a *Batson* hearing.

¶ 37    The defendant finally argues that the trial court erred in accepting the State's reason for striking Terry, because the answers she gave to the court's questioning in chambers showed that the State's reasons were false. During *voir dire*, Terry's panel was repeatedly asked if they "recognized names" on the witness list. Terry never volunteered that she recognized or knew the names of any listed witnesses. The State's proffered reason for striking Terry was that it had information that Terry "had some associations with Ms. Dean's family." During her in-chambers

questioning, done at the request of defense counsel, Terry initially reiterated, "I don't know any of the names you called." When asked, at the defendant's request, whether she knew Stephanie Box or the Box family, Terry said, "I know the name, but I don't know them." She said she "knew the names" Gerald Box and Jeb Box but did not interact with them.

¶ 38    Though the trial court found Terry to be credible, it still accepted the State's reason to strike her. We do not find that this was error. Terry admitted recognizing names on the witness list during in-chambers questioning but failed to disclose that fact after being asked at least six times during initial *voir dire*. Therefore, the trial court correctly understood that the reason for the State's peremptory challenge was that Terry was not forthcoming when asked whether anyone recognized any names on the witness list. While the trial court believed Terry's statements that she had no contact or interaction with members of Dean's family, the fact remains that she "knew and recognized" their names and failed to disclose this. The State's concerns regarding a juror's acquaintance with potential witnesses are legitimate, race-neutral reasons for exercising a peremptory challenge. *People v. Britt*, 265 Ill. App. 3d 129, 137-38 (1994). We find persuasive the following language from *People v. Martin*, 2022 IL App (1st) 123561-U, ¶ 15: "[T]here is nothing inherently discriminatory about a prosecutor's concerns about a juror who may be evasive ***."

¶ 39    The record establishes further support for the trial court's finding that the State did not engage in purposeful discrimination. Two African Americans served on the jury, including one seated before the State struck Crittendon and Terry, and one seated afterwards; the State had peremptory challenges remaining. Because we have found that the defendant's *Batson* claims are meritless, the defendant has also failed to establish required prejudice from appellate counsel's

18

objective, reasonable choice not to raise them on direct appeal. See *Williams*, 209 Ill. 2d at 243-44; *Easley*, 192 Ill. 2d at 329.

¶ 40                                    III. CONCLUSION

¶ 41    For the above reasons, we find that the trial court's conclusion that the defendant failed to make a substantial showing of a constitutional violation was correct and dismissal of his postconviction petition at the second stage was proper.


¶ 42    Affirmed.